[Civ. No. 11683. First Dist., Div. Two.—May 5, 1941.]

WALTER L. MOFFATT et al., as Executors, etc., Respondents, v. D. J. TIGHT et al., Defendants; EDWARD F. TREADWELL, Appellant.

Treadwell & Laughlin and Russell E. Barnes for Appellant.

Keyes & Erskine for Respondents.

STURTEVANT, J.—This is an appeal from a judgment in favor of the plaintiffs in an action brought to quiet title. The plaintiffs named a large number of defendants but the defendant E. F. Treadwell only has taken an appeal.

All parties to this action claim under the Woodside Country Club, a corporation. The map of subdivision 1 of the Woodside Country Club properties was recorded December 1, 1926, in Liber 14 of Maps at pages 57 and 58. This map was in three sheets, composing sheets 1, 2 and 3 of the subdivision. The map of subdivision 2 was recorded March 7, 1928, in Volume 16 of Maps, page 22. This, as well as all other subdivisions, is shown on defendants' Exhibit 5. It will be noted that the map subdivided the land into lots with the exception of certain reservations obviously for the common benefit of the subdivision, among others including "Club Reserve". The property fronted on the Portola-Woodside Road on the east, which was referred to on the map as a county road, and went up to the ridge of the mountain on the west and abutted on the La Honda Road, which was likewise designated as a county road. The principal other roads on the map were the Corte Madera Road and the Home Road and their branches, which were stated on the map to be actually existing roadways. The Corte Madera Road was connected with the Woodside-Portola Road by a "driveway" going through the Club Reserve for a certain distance and then branching, one branch, hereafter referred to as the Exit Road, going directly to the Woodside-Portola Road, and the other branch, hereafter referred to as the Entrance Road, continuing through the Club Reserve and connecting the Home Road, which in turn connected with the Woodside-Portola Road. Some of the appellant's properties fronted on the Corte Madera Road and some of them on the Home Road.

The title of the appellant was obtained by a deed from Woodside Country Club to Reginald S. Laughlin, dated July, 1929, describing all of the land with reference to the maps in question, with the exception of one and one-half lots which were obtained by deed from California Pacific Title Insurance Company to Reginald S. Laughlin on May 27, 1929. While this deed was to Laughlin, it was acquired as an asset of the firm of Treadwell, Van Fleet & Laughlin. Reginald S. Laughlin conveyed the property to appellant on July 13, 1933, by the same descriptions.

The evidence shows the conveyance of numerous lots by Woodside Country Club by reference to these maps. There are 311 lots described in the answer of the Halsey defendants, and there are some thirteen separate defendants to whom those lots were conveyed. Most of these conveyances were made before 1929.

The Woodside Country Club made a deed of trust on February 26, 1932, of the Club Reserve, describing it with reference to the maps in question. This deed of trust was foreclosed and the trustees deeded the property, on March 5, 1935, to one Lillian Wray Hunt, the original plaintiff in this action. It will be noted that the plaintiff's title accrued long after the map in question was recorded and long after the sales to the defendants with reference to such map.

The map above mentioned showed the lot owned by the plaintiffs, Club Reserve, and showed its boundary lines as extending across what are called "Entrance Road" and "Exit Road". On the map at the points where each boundary line intersects said roads the names are changed. In other words, commencing inside of the property subdivided and attempting to go out the Exit Gate, one would travel along Corte Madera Road until he came to the boundary line and at that point, although the road continues, the name is changed to "Driveway". If one leaves the Club Reserve he travels along a road marked Driveway to the Entrance Gate, and at that point the name of the road is changed to "Home Road". The evidence is all one way that the appellant Treadwell never saw the map. In 1926 when the properties were being subdivided, Mr. Lyon, who had charge of the sales, caused a sales map to be prepared known as defendants' Exhibit 5. He delivered a copy to appellant Treadwell and drove him over the driveways and roads. To other purchasers he delivered

other copies. That map does not disclose the said boundary line intersecting said roads, nor does it disclose any changes of names from Driveway to Home Road, or otherwise. There was also evidence that as an inducement to the purchasers to buy lots the vendor set forth plans that when the lots were sold and the blanket mortgage was paid out of the receipts, then the Club Reserve was to become a high class country club, to be owned largely by the purchasers as members, and to be an adjunct of the tract so subdivided. After making purchases all of the grantees, including the appellant, commenced to use and continued to use, without let or hindrance, the Home Road and the Corte Madera Road, and so much of the Driveway as was necessary to go to and from Entrance Gate and Exit Gate to their respective properties.

Additional use of the roads having shown the necessity therefor, the vendor, at an early date, constructed in the Club Reserve a cut-off which greatly tended to the safer travel on the Driveway near the Exit Gate. The management at all times permitted the free use of both the *roads* and *driveways*, but sought to have the Entrance Gate used to enter and the Exit Gate used for the purpose of leaving the tract. Other facts will be set forth in appropriate places.

 The appellant contends the recording of the map of the subdivision showing streets, roads, driveways, alleys or other highways, and the sale of lots by reference to such a map, creates a private easement in the grantee to use the streets, roads, driveways, alleys or other highways delineated on the map. (*Danielson* v. *Sykes*, 157 Cal. 686, 689 [109 Pac. 87, 28 L. R. A. (N. S.) 1024], and cases there cited.) In reply the plaintiffs contend the map which was recorded did not grant any easement to the Entrance and Exit Driveways, or Roads because the Club Reserve was bounded by a line which ran across those driveways at the intersection thereof with Woodside-Portola Road, Corte Madera Road and Home Road. The appellant replies that the argument of the plaintiffs would destroy any use of those roads, because if the lines mentioned were intended to indicate that no one should drive over them then no one could get onto those driveways from Woodside-Portola Road; that the lines are obviously imaginary, not existing on the ground, and not representing anything physical as a barrier; that the intent of the parties was made clear by the sales map used by the

grantor and given to the purchasers which showed the roads open at both intersections; that the intent was further shown by the acts of the vendor and vendees immediately after the deeds were executed relative to the use of both the roads and driveways down to the date this action was commenced; and again it was further shown by the act of the vendor in making the use of the driveways more satisfactory to the purchasers by straightening out the driveways leading to the Exit Gate; that at the time the deeds were executed the use of said gates by the purchasers was the only practical method of reaching their properties and any other construction of the contract would have created an absolute obstacle to the making of any sales by the vendor. The foregoing suggestions are given further force when it is noted that on the map filed of record there was endorsed, "The land delineated and designated hereon as Home Road, Corte Madera Road, and Meadow Road is intended and is hereby offered for dedication as streets for highways for public use. *All other roads and highways outlined exist now as such.*" The contention of the plaintiffs gives no force or effect whatever to the sentence last quoted. Because, except in the Club Reserve, there are " . . . other roads and highways outlined . . . " on the map. Furthermore, bearing in mind that the map showed Club Reserve as one lot, and upwards of five hundred other lots, it is clear that the vendor was considering the rights of the purchasers of lots as much as the rights of the holder of the Club Reserve, that by reason of the intended creation of a country club the Club Reserve was to be a benefit to the other lots and the use of the other lots was expected to be a benefit to the country club. In the light of these circumstances, it is quite clear the vendor conveyed to the appellant each of the several lots claimed by the latter and the right to use and travel the roads and driveways as contended by him.

Speaking of the rule that a purchaser of a lot in a subdivision is entitled to an easement over the streets shown on the subdivision map, the plaintiffs contend that such rule does not apply where the deed itself and the attending circumstances, the *"res gestae* of the transaction," negatives the implication of an easement. (19 C. J. 930.) We do not question the correctness of that rule. However, after all of the facts had been introduced in evidence in the instant case,

there was no circumstance supporting the contention made by the plaintiffs. Any inference or presumption that may have existed in their favor had been met and dispelled by direct evidence. In that connection it should be added that there is no contradiction whatever in the evidence. ■ The plaintiffs further contend that the issue being an interpretation of a written instrument the holding of the trial court must be accepted by this court. (*Adams* v. *Petroleum Midways Co., Ltd.*, 205 Cal. 221, 224 [270 Pac. 668] ; *Kautz* v. *Zurich Gen. A. & L. Ins. Co.*, 212 Cal. 576, 582 [300 Pac. 34].) True it is that the cases cited involve the construction of a written instrument. However those cases and others cited by the plaintiffs each rested on the particular facts introduced in evidence for the purpose of aiding the court in determining the intention of the parties. But where, as here, there is no conflict in the evidence, the question presented is solely a question of law and a court of review is bound to determine it accordingly. (6 Cal. Jur. 326–328.)

■ The appellant contends a prescriptive right was acquired to enjoy an easement as appurtenant to all of the lots and that a contrary finding is unsupported by the evidence. The plaintiffs reply that the appellant was not entitled to a finding establishing a prescriptive right unless he introduced proof showing (1) the user must be open and notorious, not clandestine; (2) it must be continuous and uninterrupted for a period of five years prior to the commencement of the action; and (3) it must be adverse and hostile to the rights of the owner of the fee, and neither expressly or tacitly permissible. (1 Cal. Jur. 608.) However they do not quote the record showing wherein the proof introduced at the trial did not meet all of the provisions of said rule. Considering the numerous facts hereinabove recited, which we have quoted directly from the record, the proof introduced showed a complete case in favor of the appellant establishing his prescriptive right. (*Myers* v. *Berven*, 166 Cal. 484, 490 [137 Pac. 260].)

After the sales had been made to the numerous purchasers and on or about February 1, 1929, Mr. Laughlin, one of the grantees, wrote a letter to Mr. C. S. Crary. At that time the project was in financial difficulty and an effort was to be made to refinance it. The letter was written on that subject. There was nothing in it showing or tending to show

that an easement theretofore conveyed to any one of the grantees was to be abandoned. The plaintiffs earnestly stress the force and effect of the letter as against the appellant. We think it is sufficient to state that we see nothing in the letter that is at all pertinent to the issues presented in the instant case.

The judgment appealed from is reversed.

Nourse, P. J., and Spence, J., concurred.

A petition for a rehearing was denied June 4, 1941, and respondents' petition for a hearing by the Supreme Court was denied June 30, 1941.